UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) Crim. No. 17-cr-40107-001 |
| OSCAR RODRIGUEZ, | ) |
| Defendant. | ) |

**SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD DEPARTURE AND VARIANCE**

Defendant, OSCAR RODRIGUEZ, by and through his Attorney, John P. Lonergan, comes before this Court for sentencing after having pled guilty to Count One of the Indictment, a charge of knowingly and intentionally distributing and possessing with intent to distribute at least 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

As indicated in the second revised Presentence Investigation Report ("PSR"), dated August 29, 2019, by the probation officer, the **Total Offense Level** for the Defendant is 39. See PSR ¶ 96. Defendant's **Total Criminal History Score** places him in Category II. See PSR ¶ 150. Defendant's sentencing guideline range is 292-365 months.

The advisory guideline range is but one factor to be considered in determining the sentence of a defendant so that it is sufficient, but not greater than necessary. See <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007) (quoting 18 U.S.S.G. § 3553(a)). The Court shall consider the following factors when determining a particular sentence:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The purpose and need for a sentence imposed;

3) The kinds of sentences available;

4) The advisory guideline range;

5) Any policy statements issued by the Sentencing Commission;

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to victims of the offense

18 U.S.S.G. § 3553(a).

After these considerations under § 3553(a), as well as other factors unique to the Defendant, including his entire background and character, <u>not</u> just the negatives characteristics and negative events reflected in his criminal history, the Court can conclude that a sentence below the advisory guidelines is an appropriate sentence for Defendant. Additionally, not only are the Guidelines not mandatory, the sentencing court is not "to presume that a sentence within the applicable Guideline range is reasonable." <u>Nelson v. United States</u>, 555 U.S. 350, 352 (2009).

## I. MOTION FOR DOWNWARD DEPARTURE AND/OR VARIANCE

1. **<u>Disparity of Methamphetamine Mixture (diluted) vs. Actual ("ICE")</u>**.

The uniqueness of pure methamphetamine that once existed is no longer the reality within the drug trade. When the Sentencing Guidelines were first drafted, it was thought that those obtaining/acquiring pure methamphetamine, commonly known as "ICE", were those at the top of the drug trade "food chain" and were considered the high-level dealers. Therefore, the penalties for those distributing ICE were more severe than those that were distributing a mixture of meth that was either a) diluted as the ICE made its way down the food chain and eventually to the streets or b) that was "shake-n-bake" meth.

The underlying theory behind increasing a defendant's sentence based on drug purity is found in the comments of U.S.S.G. § 2D1.1, which states that "since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G § 2D1.1 cmt. n. 27(c). "The point, then, of increasing a defendant's sentence based on drug purity is to punish defendants who have prominent roles in drug distribution. However, the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality. As illustrated [in the chart below], the average purity of methamphetamine today is over 90 percent. This means that the sentencing Guidelines would treat the average individual convicted of a crime involving methamphetamine as a kingpin or leader, even though that simply is not true." U.S. v. Ibarra-Sandoval, 265 F.Supp.3d 1249, 1255 (D. New Mexico, 2017).



As depicted above, since 2007, the price of pure meth has decreased from $293 per gram down to $70 per gram in 2013. Over that same time period, the purity of meth increased from 40.4% to 94%. In other words, the meth became purer as the price of meth dropped, which means that it has become more and more common as it is significantly cheaper to obtain compared to what it would cost about 12 years ago. This trend continues as depicted by the chart found in U.S. v. Nawanna where "from 2011 to 2016, the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in early 2014, and most recently, for the third quarter of 2016, averaged 93.5 percent pure." U.S. v. Nawanna, 321 F.Supp.3d 943, 951 (N.D. Iowa, 2018). See chart below.



And thus the court in Nawanna held that "because today's methamphetamine is substantially pure, purity is *not* a proxy for relative culpability." Nawanna at 951 (emphasis added). "Because of the generally very high purity of methamphetamine available today at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor present in

virtually all methamphetamine cases, not enhanced punishment based on individualized determinations, making the Guidelines purity enhancement excessive." Id. at 954. Nawanna was eventually sentenced to 200 months[1], which was a downward variance from his guideline range of 360 months to life, i.e. a downward variance of at least 160 months. He was found to be responsible for 4,406.39 grams of ICE (just shy of the next base offense level), had a Criminal History Category of V, and was assessed +3 level enhancement under U.S.S.G. 3B1.1(c).

Additionally, within each base offense level of the Drug Quantity Table, there exists a 10:1 ratio of pure meth ("ICE") to meth mixture. U.S.S.G § 2D1.1. The following are different examples and explanations, found in Nawanna, of how pure meth is punished more severely than meth mixture:

> "Defendant A, who sold 5 grams of methamphetamine to his five customers (1 gram per customer), versus Defendant B, who sold 49 grams of methamphetamine to 25 customers (almost 2 grams per customer). Without other adjustments, if Defendant A's methamphetamine is treated as ice or actual (pure) methamphetamine, his resulting base offense level is 24. Similarly, without other adjustments, if Defendant B's methamphetamine is treated as a mixture, his base offense level is 22. Thus, the Commission's judgment is that Defendant A is more culpable, even though he sold far less methamphetamine to far fewer people, but that is contrary to what a reasonable observer would like conclude".

Nawanna at 952.

Additionally, the prosecution in Nawanna, agreeing with the defendant's example above, provided its own example:

> In response, the prosecution argues that, if Nawanna's position is adopted, it leads to the perverse result that a defendant who sold 150 grams of pure methamphetamine, treated as pure methamphetamine, would be treated the same as a defendant who sold 4 kilograms of actual (pure) methamphetamine whose methamphetamine was treated as a mixture. That is precisely the result of the *current* Guidelines calculation, based on the 10-to-1 ratio, which would score both defendants as level 32. (Citation omitted). On the other hand, if the methamphetamine attributed to both defendant is treated as methamphetamine

---

[1] This was prior to any credit given for Nawanna's substantial assistance under U.S.S.G. § 5K1.1.

> mixture, as Nawanna argues it should be, the defendant who sold 150 grams of methamphetamine would be scored as level 24, while the defendant who sold 4 kilograms of methamphetamine would still be scored as level 32. The difference *does* more properly reflect the relative culpability of the two defendants.

Nawanna at 958 n.7.

Both examples efficiently describe the problem with the Guidelines' handling of pure meth vs. meth mixture considering the change that has occurred over the past 15-20 years that has resulted in the new normal of pure meth being found everywhere.

In U.S. v. Ortega, the Court found that a sentence below the guideline range was appropriate for Ortega because he was "at most, a street-level distributor, dealing drugs in the same purity as most methamphetamine sold on the street"…and "to punish him as harshly as an upper-level distributor because of a presumptive ten-to-one ratio does not reflect his position in the hierarchy nor will it promote respect for the law." U.S. v. Ortega, 2010 WL 1994870 at 7 (D. Nebraska, 2010). Additionally, the Court in U.S. v. Harry states that "there seems to be no empirical evidence supporting the need for a drastically-increased sentence based solely on the purity of the meth at issue. U.S. v. Harry, 313 F.Supp.3d 969, 973 (N.D. Iowa, 2018). In Harry, after the defendant was found guilty at jury trial of possession with intent to distribute at least 50 grams of pure meth, the Court sentenced the defendant to 280 months, which was a downward variance from the defendant's guideline range of 360 months to life, i.e. a downward variance of at least 80 months. The defendant in Harry was found responsible for 1,800.3 grams of pure meth and had a Criminal History Category of VI.

In Spears v. U.S., the Court held a sentencing judge has the power to "reject the disparity created by the crack-to-powder ratio." Spears v. U.S., 555 U.S. 261, 265 (2009). Like the Court in Spears, the sentencing courts in meth cases have begun to follow suit to that of the crack-cocaine sentencing courts; and they have addressed the disparity that exists between pure meth

("ICE") and meth mixture, i.e. the 10:1 ratio disparity between pure meth ("ICE") and a meth mixture. As such, like the sentencing court in Ortega, the Court here can reject the higher ratio that is to be assessed pure meth and therefore reject the 4-level increase, which is the result of a 10:1 ratio between pure meth ("ICE") and a meth mixture.

In U.S. v. Hayes, the sentencing court followed the court's recommendation in Spears and reduced the guideline range by one-third "in response to the fundamental problems with the methamphetamine Guidelines range. The one-third reduction is a good starting point and a reasonable way to express [the court's] policy disagreement with the Guidelines." U.S. v. Hayes, 948 F.Supp.2d 1009, 1031 (N.D. Iowa, 2013).

In Nawanna, the court rejected the methamphetamine guidelines based on two reasons: 1) because they "are based on a flawed assumption that methamphetamine purity is a proxy for role in the offense," Nawanna at 954; and 2) because the 10:1 ratio of pure meth to a meth mixture is not based on empirical evidence, which creates a Guidelines range for pure meth that is not in the "heartlands." Id. at 950-955. Even the prosecution in Nawanna admitted with the defendant's argument that the 10-to-1 ratio is unsupported by and not based on empirical evidence. Nawanna at 950-951. Furthermore, the parties in Nawanna agreed that they "were unaware of any statement in the guidelines or elsewhere of why only certain controlled substances, including meth, are singled out in the Guidelines themselves for enhancement based on purity, while others, such as heroin, are not. Nawanna at 949.

In Harry, the Court adopted the approach used and described in Nawanna, i.e. based on policy disagreement, when the Court calculated an "alternative Guidelines range, starting with a base offense level determined by reference to the methamphetamine mixture Guidelines." Harry at 974. "While it may seem logical to punish a pure substance more than mixed substance, there

is no support in the legislative history to explain the formula underlying greater methamphetamine purity to greater months of imprisonment." Hayes at 1025.

Additionally, take the recent and significant rise in fentanyl-based overdoses nationwide. As it pertains to the Central District, Peoria County Coroner reported 71 fentanyl-related overdoses in heroine starting in 2016 through November, 2018. *Peoria Counts Cost of Fentanyl Deaths after CDC Names Its Deadliest Drug.* December 12, 2018, https://week.com/news/2018/12/12/peoria-counts-cost-of-fentanyl-deaths-after-cdc-names-it-deadliest-drug/. This rise in overdose-related deaths is caused, at least in some cases, by the drug users not knowing what is in the drug mixture.

2.      **Double counting for "Purity" and "Role in Offense"**.

Like the defendant in Nawanna, Defendant argues here that the 4-level enhancement for meth purity (versus the base offense level for meth mixture) and the 4-level enhancement for role in the offense punishes him twice for the same reason. "Because the purity-based meth guidelines improperly punish virtually all defendants for their *assumed* role in the offense…they result in sort of 'double counting' when a defendant is further enhanced 4 levels for his or her *actual* role in the offense pursuant to U.S.S.G. 3B1.1(b)." Nawanna at 954. The Defendant's 4-level enhancement for "role in the offense" is a *defendant-specific* enhancement, based on his *actual* role as "organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)." U.S.S.G. 3B1.1(c). However, Defendant's guideline sentence has *already* been enhanced 4 levels based on a flawed assumption about his role in the offense simply because the meth in this case is pure and without any individualized determination. As in Nawanna, Mr. Rodriguez submits that this Court may also conclude that "the proper way to consider [a defendant's] role in the offense…is not [to be] based on such an assumption,

8

particularly a demonstrably erroneous assumption, based on purity, but on an individualized determination pursuant to U.S.S.G. 3B1.1.  <u>Nawanna</u> at 955.

3.      **<u>The Methamphetamine Guidelines are not Heartlands</u>**.

> The Commission intends the sentencing courts to treat each guideline as a carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes.  When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.
>
> U.S. Sentencing Guidelines Manual § 1.6 (1987).

It was the intention of the Commission to make each sentencing guideline a heartland so that there would exist a consistency in sentencing such that a departure from the guideline would be a rare occurrence.  Despite that intention, "sentencing data over the years reveal that the Guidelines range for methamphetamine offenses do not constitute the typical case or heartland." <u>Hayes</u>. at 1030.  In 2017 and "for the third year in a row, methamphetamine offenses were the most severely punished drug crime, with an average length of imprisonment of 91 months."  U.S Sentencing Commission, Overview of Federal Criminal Cases, Fiscal Year 2017, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2018/FY17_Overview_Federal_Criminal_Cases.pdf.  In 2017, only **30.1%** of methamphetamine trafficking offenders were sentenced within their range, and **0%** were sentenced above their range; in other words, almost **70%** of methamphetamine trafficking offenders were sentenced **below** their guideline range.  U.S. Sentencing Commission, Quick Facts Methamphetamine Trafficking Offenses available at

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Methamphetamine_FY17.pdf (emphasis added) (hereinafter "Quick Facts") and attached hereto as Exhibit A.  Additionally, in 2017, methamphetamine trafficking offenders received an average reduction in their *non-government sponsored* sentence of **33.8%** regardless of the weight, i.e. "The median Base Offense Level in these cases was 32.  This corresponds to a quantity of drugs between 3.3 and 11.0 pounds of methamphetamine." U.S. Sentencing Commission, Quick Facts Methamphetamine Trafficking Offenses available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Methamphetamine_FY17.pdf. See Quick Facts (emphasis added).  This type of pattern, i.e. that methamphetamine sentences below the guideline range is the standard, indicates that the Guideline range for methamphetamine offenses is not the heartland and that the guideline ranges need to be adjusted down.  "The heartland itself is flawed.  The high number of downward departures indicates that the Guidelines range is not a heartland or typical case." Hayes at 1030.  "A district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the 'heartland' to which the Commission intends individual Guidelines to apply.'" Kimbrough at 89 (*citing* Rita, 551 U.S. at 351).

4. **The Methamphetamine Guidelines are not based on Empirical Data**.

In United States v. Hayes, 948 F.Supp.2d 1009 (2013), Judge Bennett issued a sentencing order wherein he addressed several issues concerning the methamphetamine sentencing guidelines, including the development of the sentencing guidelines as compared to the development of the methamphetamine guidelines.  His sentencing order cited prior case law, federal law, reports to Congress, and other publications and reports.  To say the least, the

sentencing order was thorough.  A courtesy copy of Judge Bennett's sentencing order was sent to the Court for this Court's review.

One of the main points of the Judge Bennett's sentencing order is that the original sentencing guidelines were developed through an empirical approach that included analysis of 10,000 presentence reports. Hayes at 1019.  The Court repeatedly praised the empirical process by which the Guidelines were written, Id., after all, it is the Commission's role to draft the guidelines and to "base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007).

However, when it came to drug-trafficking offenses, the Commission did not use the same empirical approach in developing guideline ranges, and instead the Commission conformed the drug-trafficking guideline ranges with the statutory minimums that were being implemented by Congress as a result of certain political and social atmospheres, e.g. "Congress swiftly enacted the Anti-Drug Abuse Act of 1986" as a result of the drug overdose death of Len Bias, a University of Maryland basketball player.  Hayes at 1020.  The mandatory minimums that were being implemented by Congress, which focused on the drug weight and quantity, effectively raised the guideline ranges for drug-trafficking offenses.

Judge Bennett went on to analyze the sentences imposed for methamphetamine cases and found that in 2011, the average sentence length was 144 months for methamphetamine offenders; this was the "highest average sentence length for any drug type," even though only **38.3%** of methamphetamine offenders that were subject to a mandatory minimum in 2011 received a sentence within the Guidelines range. Id. at 1025 (emphasis added).  In other words, over **60%** of methamphetamine offenders were receiving sentences below the guideline range, yet the

11

average sentence was still the highest average sentence among drug-trafficking offenses. "Thus, methamphetamine Guidelines are entitled to less deference than those Guidelines that were based on the Commission's exercise of institutional expertise and empirical analysis." Id. at 1027. "A variance based on a policy disagreement is particularly appropriate for methamphetamine offenses because the Guidelines range results in sentences greater than necessary to achieve sentencing objectives and the Guidelines are not based on empirical data and national experience. Hayes at 1031 (citing Kimbrough v. United States, 552 U.S. at 96 (2007) ("The Commission did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses."); (citing Gall v. U.S., 552 U.S. 38, 46 n.2 (2007) ("[T]he Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes.").

That being said, Mr. Rodriguez submits to this Court that, for reasons stated herein, a sentence below not only the guideline range, but also below the career offender guideline range is appropriate.

5.  Support – Character Letters.

Mr. Rodriguez submits multiple character and support letters written by his family and friends. Said letters are attached hereto as Group Exhibit A.

6.  Role in the Offense- Organizer or Leader.

Defendant has objected to the application of the 4-point upward adjustment for his role in the offense for being leader or organizer. However, he does not deny that some adjustment for role in the offense is appropriate. Defendant's position is that he should not be held as Organizer or Leader that would merit a 4-point adjustment. Defendant acknowledges that he was a major

supplier of methamphetamine in the charged conspiracy. Given the flexible nature of the application of the Role in the Offense adjustment, the lesser application of 3-points would be more appropriate given the limited control he exercised over any other member of the conspiracy.

In addition, Defendant also argues that, as set forth above, the application of the leadership enhancement would constitute a form of double-counting as the 10-1 ratio disparity for Meth v. Meth (Actual) exists, at least in part, as Meth (Actual) was supposed to be a substance that someone in a leadership position would possess.

WHEREFORE, the Defendant, OSCAR RODRIGUEZ, respectfully requests of this Court, for the reasons contained in this Sentencing Memorandum and Motion for Downward Departure and Variance, the following:

A. For a downward departure from his Sentencing Guideline range;

B. For a downward variance from his final Sentencing Guideline range; and

C. For any other relief that the Court deems equitable and just under the circumstances.

/s/ John P. Lonergan
Illinois Bar No. 6212031
Attorney for Defendant
416 Main Street, Suite 409
Peoria, IL 61602
Phone: 309-673-4357
Fax: 844-683-3939
Email: john@johnloneganlaw.com


## CERTIFICATE OF SERVICE

    I hereby certify that on December 4, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

    Kevin Knight
    Assistant U.S. Attorney

    /s/ John P. Lonergan
    Illinois Bar No. 6212031
    Attorney for Defendant
    416 Main Street, Suite 409
    Peoria, IL 61602
    Phone: 309-673-4357
    Fax: 844-683-3939
    Email: john@johnloneranlaw.com